# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **DERRICK MILLER,** | * | |
| **Plaintiff,** | * | |
| **v.** | * | |
| | * | **CIVIL NO. JKB-21-0995** |
| **BRIGHTKEY, INC.,** | * | |
| **Defendant.** | * | |

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

## MEMORANDUM

Plaintiff Derrick Miller has brought claims against his former employer, Defendant BrightKey, Inc. ("BrightKey") for racial discrimination and retaliation under the Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e, *et seq.*; discrimination on the basis of disability under the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, *et seq.*; and violations of Maryland Fair Employment Practices Act ("FEPA"), MD. CODE ANN., STATE GOV'T §§ 20-601, *et seq.*, and the Howard County Human Rights Act ("HCHRA"), Howard County, Maryland Code §§ 12.200, *et. seq.* (*See* Compl., ECF No. 1.) Now pending before the Court is Defendant's Motion to Dismiss for Failure to State a Claim. (Mot. Dismiss, ECF No. 13.) The motion is fully briefed, and no hearing is required. *See* Local Rule 105.6 (D. Md. 2021). For the following reasons, an Order will issue granting in part and denying in part Defendant's motion to dismiss.

## I.    Background[1]

Plaintiff is a fifty-year-old gay Black man who suffers from severe diabetes and high blood pressure. (Compl. ¶¶ 1, 22.) Plaintiff joined Defendant as a Project Manager in 2012 and was subsequently promoted several times, ultimately becoming Defendant's Director of Corporate Communications. (*Id.* ¶¶ 20.)

### A. Allegations of Disability Discrimination and Retaliation

In mid-March 2020, Plaintiff began working from home due to the COVID-19 pandemic. (*Id.* ¶ 22.) Shortly thereafter, Plaintiff confirmed with his physician that he would be at risk of serious illness if he contracted COVID-19 due to his diabetes mellitus. (*Id.* ¶ 23.) He obtained a doctor's note to this effect and provided it to Defendant. (*Id.* ¶¶ 23–24.)

On June 5, 2020, Defendant's Vice President of Human Resources Sheri Lewis followed up with Plaintiff "to see if his doctor has provided him with a timeline for returning to the physical office." (*Id.* ¶ 25.) Plaintiff reiterated that he currently "did not feel safe returning to the office, but that nonetheless he was able to successfully complete all of his work remotely from home." (*Id.*) Five days later, Defendant's Vice President of Operations Gregory Krehbiel emailed Plaintiff to let him know that Defendant expected Plaintiff to return to the office by June 22, 2020. (*Id.* ¶ 26.) In response, Plaintiff requested "reasonable accommodation due to his diabetes and hypertension and their high-risk associations with Covid-19." (*Id.*)

On June 22, 2020, Defendant's President and Chief Executive Officer ("CEO") Rita Hope Counts called Plaintiff and allegedly "attempted to strong-arm [Plaintiff] into returning to work at the office" telling him "that she did not care about his underlying medical conditions or providing him with any accommodation to secure his safety." (*Id.* ¶¶ 27–29.) Counts also allegedly

---

[1] The facts in this section are taken from the Amended Complaint and construed in the light most favorable to Plaintiff. *See Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997).

suggested that Plaintiff would not have diabetes if he better managed his health and that another employee, who is a white woman, did not take insulin and was willing to come into the office. (*Id.* ¶ 29.) Later that day, Plaintiff emailed Counts to "express that he was upset by her comments, and complain that she had violated HIPAA privacy rules by providing him with confidential details about the White female employee being a diabetic and not taking insulin." (*Id.* ¶ 30.) On June 24, 2020, Plaintiff provided additional documentation from his physician directly to Counts, "reiterating once again in writing that Miller is at high risk of serious consequences from contracting Covid-19 because of his pre-existing medical conditions." (*Id.* ¶ 31.) He was terminated by Defendant the following week. (*Id.*)

### B. Allegations of Racial and Gender Discrimination and Retaliation

While the timing of Plaintiff's termination coincides with his requests for disability accommodation, his allegations tie his termination more directly to circumstances stemming from the killing of George Floyd by Minneapolis Police Department Officer Derek Chauvin. (*Id.* ¶ 32.) On June 4, 2020, Plaintiff reached out to Counts and asked if Defendant planned to send an internal message regarding systemic racism in the wake of Floyd's death. (*Id.* ¶ 34.) Plaintiff had seen statements and other actions taken by Defendant's clients and believed that a similar, internal message from Defendant was "warranted so that employees of color know that they are working for an organization that cares and acknowledges the pain that they must be feeling." (*Id.* ¶¶ 32– 34 (internal quotation marks omitted).) Based on his role as Director of Corporate Communications, Plaintiff offered to draft a preliminary statement for Counts' review. (*Id.* ¶ 34.) Five days later, Counts informed Plaintiff that a committee of three white employees—including Krehbiel—would be responsible for the corporate response to Floyd's death. (*Id.* ¶ 35.)

3

On June 29, 2020, Plaintiff found public YouTube videos in which Krehbiel made "offensive extremist racist, homophobic and transphobic comments." (*Id.* ¶ 39.) Plaintiff alleges that with "a few simple key-strokes" he was able to locate "roughly 100 racist, anti-gay, and anti-transgender" videos posted by Krehbiel, including videos of Krehbiel and a friend "laugh[ing] at and ridicul[ing] hate crimes and deaths of gay people, [and] . . . using derogatory, racist language about Blacks and homosexuals, including the 'N-word.'" (*Id.* ¶¶ 39–40.) After viewing part of one of the videos, Plaintiff called Counts and left a voicemail, which Counts did not return, urging Krehbiel's termination from the company. (*Id.* ¶¶ 9, 41.)

With no response from Counts, Plaintiff sent a company-wide email the next day "calling for Krehbiel's departure from the Company as a result of his horrendous and inappropriate behavior." (*Id.* ¶ 41; *see also* EEOC Charge at 2, Mot. Dismiss Ex. 1, ECF No. 13-2.) Defendant responded to this email, acknowledging Plaintiff's concerns and expressing the company's intention to investigate Plaintiff's allegations against Krehbiel. (Compl. ¶ 43.) Defendant did not, however, place Krehbiel on leave during the pendency of the investigation. (*Id.*)

On July 1, 2020, a group of Defendant's employees staged a walkout and refused to work while Krehbiel remained at the office. (*Id.* ¶ 44.) By noon, Krehbiel had been terminated, a decision allegedly announced by Counts by "walk[ing] angrily through the facility telling staff in a hostile manner that Krehbiel was gone and they should all just get back to work." (*Id.*)

On the same day, Plaintiff was called into a meeting with Defendant's Senior Vice President and General Counsel Lynden Renwick and Chief Operations Officer Jeff Coleman. (*Id.* ¶ 56.) Renwick and Coleman asked Plaintiff "how he thought the Company should change" and "why he did not reach out to Counts and other members of the executive team at the Company to complain earlier about Krehbiel's racist and other hateful behavior." (*Id.*) Plaintiff explained that

4

he decided to raise his concerns about Krehbiel publicly as a result of Counts' previous unresponsiveness to his complaints and her "history of discriminatory treatment." (*Id.*) Renwick told Plaintiff at the end of the meeting that Plaintiff was terminated from the company, effective immediately. (*Id.* ¶ 57.) Plaintiff was told that "the reason for [his] discharge was due to the manner in which [he] handled the situation with a company-wide email instead of bringing this issue to the attention of upper management and the CEO." (EEOC Charge at 2.)

### C. *Other Allegations of Racial Discrimination*

The Complaint also alleges other instances of racial discrimination by Defendant that are not referenced in the charge he filed with the Equal Employment Opportunity Commission (the "EEOC Charge" or "Charge"). (*Compare* Compl. ¶¶ 45–54, *with* EEOC Charge at 2.) For instance, Plaintiff alleges instances where white and Black employees received disparate discipline for similar infractions—with white employees receiving less severe punishment. (*Id.* ¶¶ 45–49.) Plaintiff was personally involved in at least one of these cases, when he threatened to resign if a white employee was not terminated after he "access[ed] a client's secure member database and post[ed] controversial discriminatory opinions there about then President Barack Obama that specifically questioned whether President Obama was American and Muslim." (*Id.* ¶ 47–48.)

Plaintiff further alleges that he was paid "less than all other Directors at the Company who were White, despite the fact that several of them were employed by [Defendant] for roughly the same amount of time as [him and] were of similar qualifications." (*Id.* ¶ 50.)

In addition, Plaintiff also alleges that on August 18, 2018, Counts organized a "*Gone with the Wind* themed party [that was] taken quite literally." (*Id.* ¶ 51.) He alleges that guests, including Counts' brother, attended the party in full blackface and that "the party space was strewn with photos of White Confederate Generals and a large Confederate flag covering one side of the party

5

room." (*Id.* ¶ 51–52.)  Although Plaintiff only made a brief appearance at the party, he overheard Counts lament that some of Defendant's managers and other party guests were upset by the party theme, which was "just a 'joke.'"  (*Id.* ¶ 52.)

### D. EEOC Proceedings and Charge

Plaintiff filed his EEOC Charge on August 31, 2020. (*See* EEOC Charge at 1.)  The Charge briefly details allegations similar to those included in the parts of the Complaint related to Plaintiff's accommodation request and termination.  *See supra* Parts I.B, C.  Plaintiff also specifically averred that he believed that his termination was retaliatory in violation of Title VII. (EEOC Charge at 1–2.)  The following day, the EEOC issued a "Dismissal and Notice of Rights," permitting Plaintiff to file a lawsuit based on the conduct detailed in the Charge within ninety days of his receipt of the notice.  (*See* Dismissal and Notice of Rights at 1, Mot. Dismiss Ex. 2, ECF No. 13-3.)

In an attempt "to work towards exploring a mutual resolution of any claims or disputes" the parties entered into a Tolling Agreement effective on November 20, 2020.  (*See* Tolling Agreement at 1, 3, Mot. Dismiss Ex. 3, ECF No. 13-4.)  The parties later mutually agreed by email to extend the tolling period under the Agreement.  (*See* Mot. Dismiss Ex. 4, ECF No. 13-5.)  As amended, the Tolling Agreement "suspended and tolled" the "running of any statute of limitations or any other statute, law, rule, contractual limitation or principle of equity of similar effect" until either March 15 or April 15, 2021 depending on whether the parties formally agreed to the final extension that they contemplated.  (*Compare* Opp'n Mot. Dismiss at 11, ECF No. 14, *with* Reply at 19 n. 1, ECF No. 15.)  Plaintiff filed his Complaint on April 22, 2021.  (*See* Compl.)

6

## II.   Legal Standard

When considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must "accept as true all well-plead allegations and view the complaint in the light most favorable to the plaintiff." *Venkatraman v. REI Sys., Inc.*, 417 F.3d 418, 420 (4th Cir. 2005). To survive, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 662. "A pleading that offers 'labels and conclusions' or . . . 'naked assertion[s]' devoid of 'further factual enhancement'" will not suffice. *Id.* (alteration in original) (quoting *Twombly*, 550 U.S. at 555, 557).

Courts "passing on a motion to dismiss may consider attachments to a complaint or the motion to dismiss if 'integral to the complaint and authentic.'" *Leichling v. Honeywell Int'l, Inc.*, 842 F.3d 848, 851 (4th Cir. 2016) (quoting *Philips v. Pitt City Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)). A document is integral to the complaint "where the complaint relies heavily upon its terms and effect." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (internal citation and quotations marks omitted). In this case, three documents—the EEOC Charge; the Dismissal and Notice of Rights; and the parties' amended Tolling Agreement—are necessary to resolve threshold issues of timeliness and administrative exhaustion. Because these documents are fundamental prerequisites to this lawsuit, they are integral to the complaint. *See Fort Bend Cnty., Tex. v. Davis*, 139 S. Ct. 1843, 1851–52 (2019) (explaining that the EEOC charge filing requirement is a mandatory claims-processing rule). As neither side disputes the authenticity of

these documents, they will all be considered by the Court at this stage without converting Defendant's motion to one for summary judgment.

### III.   Analysis

Plaintiff alleges that he was discriminated against and terminated on the basis of his race, gender, and disability in violation of federal and state law. Defendant argues that Plaintiff's claims should be dismissed because they are untimely, are barred by the administrative exhaustion requirement, and fail to state claims upon which relief can be granted. (*See* Mot. Dismiss ¶¶ 2–3, ECF No. 13.) As explained below, the Court does not believe that these arguments have merit with respect to claims stemming from Plaintiff's termination. However, Plaintiff's claims based on a hostile work environment or disparate pay (*see* Opp'n Mot. Dismiss at 20) exceed the scope of the EEOC Charge and, accordingly, are administratively barred.

### A. Timeliness

Defendant first argues that the Complaint is untimely under the Tolling Agreement as negotiated, and subsequently amended, by the parties. "Title VII requires that an aggrieved person file a civil action within 90 days of receiving a right-to-sue letter from the EEOC." *Quinn v. Copart of Conn., Inc.*, 791 F. App'x 393, 395 (4th Cir. 2019) (citing 42 U.S.C. § 2000e-5(f)(1) (2012)); *see also* 29 C.F.R. § 1601.28(e)(1) (applying same limitation to ADA claims). The Fourth Circuit has "explicitly recognized that the 90-day requirement is 'in the nature of a statute-of-limitations defense,'" *id.* (quoting *Laber v. Harvey*, 438 F.3d 404, 429 n.25 (4th Cir. 2006)), and is therefore "subject to waiver, estoppel, and equitable tolling." *Edelman v. Lynchburg Coll.*, 300 F.3d 400, 404 (4th Cir. 2002) (quoting *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982)). Here, the Tolling Agreement purports to estop the parties from "asserting any claim or defense which relies, in whole or in part, on any period of time which elapses during the Tolling

Period." (Tolling Agreement at 2.) The "Tolling Period" was initially from November 20, 2020 until January 31, 2021 but was subsequently extended by the parties. (*See id.* at 3; Mot. Dismiss Ex. 4.) Defendant argues that despite the Agreement, Plaintiff's claims are untimely for two independent reasons.

Primarily, Defendant argues that the Tolling Agreement required Plaintiff to file his Complaint on or before the expiration of the Tolling Period, and as a result, Plaintiff's Complaint is a week late. (*See* Mot. Dismiss Mem. Supp. at 4, ECF No. 13-1.) Plaintiff contends that the Tolling Agreement did not set a new deadline for his Complaint, but rather suspended the running of the current deadline for the duration of the Tolling Period. (Opp'n Mot. Dismiss at 13.) Therefore, because Plaintiff had two weeks left to file his Complaint when the parties originally entered into the Tolling Agreement, Plaintiff claims that he had two weeks left to file his Complaint when the Tolling Period expired. (*Id.* at 13.) Under this reading, Plaintiff filed his Complaint a week *before* the deadline. (*Id.* at 14.)

Plaintiff's view is more congruent with the ordinary meaning of tolling, which generally "means that the limitations period is suspended (stops running) . . . then starts running again when the tolling period ends, *picking up where it left off.*" *Artis v. Dist. of Columbia*, 138 S. Ct. 594, 601 (2018) (emphasis added) (citing BLACK'S LAW DICTIONARY (6th ed. 1990)). The Tolling Agreement confirms that the parties contemplated the ordinary meaning of tolling by expressly providing that "the Tolling Period End Date will have the same significance as the Effective Date for purposes of any statute of limitations." (Tolling Agreement at 3.) Other provisions similarly support this ordinary use reading of the Tolling Agreement (*see, e.g., id.* at 2), and Defendant fails to identify any specific language that supports its alternative reading.

In their reply, Defendant argues that "[t]echnically, the [April 15] deadline was never accepted by Plaintiff, and [therefore] the last agreed-upon deadline was March 15." (Reply at 19 n. 10.) Ironically, Defendant's argument is untimely because ordinarily, "an argument raised for the first time in a reply brief or memorandum will not be considered." *Clawson v. FedEx Ground Package Sys., Inc.*, 451 Supp. 2d 731, 734 (D. Md. 2006). Defendant does not explain why the Court should depart from typical federal court practice, and accordingly, this alternative position fails.[2] Plaintiff's Complaint is timely filed.[3]

### B. Scope of the EEOC Charge

Defendant next argues that various claims brought by Plaintiff exceed the scope of the EEOC Charge and that Plaintiff has failed to exhaust his administrative remedies with respect to those claims. (*See* Mot. Dismiss Mem. Supp. at 5–10.) Allegations in an administrative charge "generally operate to limit the scope of any subsequent judicial complaint . . . [to] those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962–63 (4th Cir. 1996) (citation omitted). Defendant

---

[2] Even were the Court to consider this argument on the merits, Defendant's email agreeing to an April 15 extension would likely be grounds for promissory estoppel, which requires: "(1) a clear and definite promise; (2) where the promisor has a reasonable expectation that the officer will induce action or forbearance on the part of the promisee; (3) which does induce actual and reasonable action or forbearance by the promisee; and (4) causes a detriment which can only be avoided by the enforcement of the promise." *Oliveira v. Sugarman*, 130 A.3d 1085, 1103 (Md. Ct. Spec. App. 2016) (citing *Pavel Ent., Inc. v. A.S. Johnson Co.*, 674 A.2d 521 (Md. 1996)). Because a time-bar defense is subject to estoppel, *Edelman*, 300 F.3d at 404, Defendant would likely be estopped from relying on this alternative theory, even if it had been timely raised.

[3] Plaintiff asks the Court to impose sanctions against Defendant on the grounds that Defendant "ignor[ed] the plain language of the Tolling Agreement and [sought] to circumvent it with this frivolous motion." (Opp'n Mot. Dismiss at 12 n. 3.) While the Court agrees that Plaintiff's reading of the Tolling Agreement is correct, the Court does not believe that Defendant's position is so frivolous as to warrant the imposition of sanctions. After all, the U.S. Supreme Court recently resolved a nearly identical dispute between state supreme courts about the meaning of "tolled" in 28 U.S.C. § 1367(d). *See Artis*, 138 S. Ct. at 601. Additionally, Plaintiff appears to suggest that sanctions are appropriate here because Defendant has violated the Tolling Agreement by initiating parallel state litigation during the Tolling Period. (*See* Opp'n Mot. Dismiss at 12 n. 3.) If Plaintiff believes that the state litigation violates the Tolling Agreement and is being pursued in bad faith, the appropriate place to raise those arguments is before the relevant state court.

argues that the only claim that can be reasonably inferred from Plaintiff's EEOC Charge is Plaintiff's claim for retaliatory termination under Title VII. (*See* Mot. Dismiss Mem. Supp. at 7.)

"As far as determining what claims were stated in the initial charge, courts construe administrative charges liberally." *EEOC v. Phase 2 Invs., Inc.*, 310 F. Supp. 3d 550, 565 (D. Md. 2018) (internal quotation marks and citation omitted). Courts decline to treat "the EEOC charge as a common-law pleading that strictly cabins the investigation" because such administrative charges are generally not drafted by attorneys. *Id.* (internal quotation marks and citation omitted). That said, the "administrative charge is not simply a formality to be rushed through so that an individual can quickly file his subsequent lawsuit. Rather, Congress intended the exhaustion requirement to serve the primary purposes of notice [to the employer] and conciliation." *Chacko v. Patuxent Inst.*, 429 F.3d 505, 510 (4th Cir. 2005). Because the administrative charge is intended to provide notice to the employer, and ideally, to remedy discrimination more quickly than the "ponderous pace of formal litigation," *id.* (internal quotation marks omitted), "a plaintiff fails to exhaust his administrative remedies where the administrative charges reference different time frames, actors, and discriminatory conduct than the central factual allegations in his formal suit." *Mercer v. PHH Corp.*, 641 F. App'x 233, 238 (4th Cir. 2016).

Plaintiff's EEOC Charge alleges two circumstances contemporaneous with his termination—his request for an accommodation for his disability and his company-wide email regarding Krehbiel's YouTube videos. (*See* EEOC Charge at 1–2.) In the Charge's conclusion, Plaintiff argues that his termination was discriminatory and retaliatory in violation of Title VII. (*Id.* at 2.) Despite this narrower conclusion, a liberal construction of Plaintiff's EEOC Charge requires this Court to conclude that Plaintiff's ADA claims are at least "reasonably related to the original complaint." *Evans*, 80 F.3d at 962–63. The Charge notes that Plaintiff requested an

11

accommodation for his disability less than a month before his termination. *Cf. Peters v. Balt. City Bd. of Sch. Com'rs*, Civ. No. WMN-13-3114, 2014 WL 1682001, at *2 (D. Md. Apr. 28, 2014) (finding that a claim was unexhausted where "Plaintiff's EEOC Charge contains no reference to any facts relating to [the relevant form of] discrimination"). The close temporal nexus between Plaintiff's disability accommodation request and his termination suggests that Defendant may have impermissibly considered Plaintiff's accommodation request in its decision to terminate him. *See Romeo v. APS Healthcare Bethesda, Inc.*, 876 F. Supp. 2d. 577, 588 (D. Md. 2012) (holding two-month gap between protected activity and termination suggested causal link between them).

While the Charge can be generously construed to allege that Plaintiff's termination was impermissibly based on his race, gender, *and* disability, it fails to provide Defendant with notice of Plaintiff's broader allegations related to a hostile work environment and unequal pay. For instance, in the "Discrimination Based On" section, the Charge notes only "Retaliation." (*Id.* at 1); *see also Mercer*, 641 F. App'x at 238–39 (noting that while "failure to check a box on the form is not dispositive . . . the absence of a checked box is [ ] one factor in [the scope of the charge] analysis"). Similarly, in the "Date(s) Discrimination Took Place" section, the Charge lists both the earliest and latest date of discrimination as July 1, 2020, the date of Plaintiff's termination. (EEOC Charge at 1); *see also Davidson v. Sarnova, Inc.*, Civ. No. JKB-17-1067, 2017 WL 3581999, at *4 (D. Md. Aug. 18, 2017) (finding that the litigation claim exceeded the scope of the charge where the "administrative charge identified an isolated incident—Plaintiff's termination . . . . [and] the First Amended Complaint allege[d] that Defendant engaged in a pattern of retaliatory conduct"). Indeed, the Charge is devoid of any statements supporting the Complaint's allegations of disparate treatment of other employees, *Gone with the Wind* parties, or unequal pay. *See Nnadozie v. Genesis Healthcare Corp.*, 730 F. App'x 151, 161 (4th Cir. 2018) (internal quotation

marks and citation omitted) (cleaned up) ("A claim will typically be barred if the administrative charge alleges one type of discrimination—such as discriminatory failure to promote—and the claim encompasses another type—such as discrimination in pay and benefits.").

Plaintiff contends that this deficiency is remedied by the fact that these broader allegations are found in two supplemental documents—a transcript of Plaintiff's interview with the EEOC and Plaintiff's EEOC intake questionnaire. Plaintiff fails to establish that either of the supplemental documents warrant expansion of the scope of the Charge. Specifically, while the Fourth Circuit has at times considered whether to consider documents other than a formal charge for purposes of exhaustion those documents must "put the charged party on notice of the claims raised against it." *Sloop v. Mem'l Mission Hosp., Inc.*, 198 F.3d 147, 149 (4th Cir. 1999). In cases where a defendant "was never apprised of the contents of [a document]" those documents cannot be considered part of the charge because they "make[] no difference for the goals of putting [an] employer on notice or encouraging conciliation." *Balas v. Huntington Ingall Indus., Inc.*, 711 F.3d 401, 408 (4th Cir. 2013).

Here, Plaintiff provides no authority supporting the proposition that this Court may consider the transcript, which serves neither of the principal purposes of a Charge, *i.e.* "notif[ying] the charged party of the asserted violation" and "securing [ ] voluntary compliance with the law." *Id.* at 407. Further, while some cases do support treating intake questionnaires as formal charges for exhaustion purposes, Plaintiff does not allege that the EEOC questionnaire was disclosed to Defendant. *See Maynor v. Mt. Washington Pediatric Hosp.*, 93 F. Supp. 3d 434, 439 (D. Md. 2015) (distinguishing *Balas* "because the EEOC appears to have treated the questionnaire as a formal charge"). And in fact, Defendant represents that it "was never apprised of the contents of Plaintiff's Intake Questionnaire until he filed his Opposition on June 7, 2021." (Reply at 9.) *Balas*

requires that at a minimum, Defendants must be "apprised of the contents" of the EEOC

questionnaire, before the allegations contained therein can be considered to broaden the scope of

the formal charge.  711 F.3d at 408 (declining to consider letters written to EEOC by plaintiff

where letters were not provided to defendant).  Because Defendants were not apprised of the

contents of that questionnaire until Plaintiff's filed their opposition to the pending motion, the

Court cannot consider the intake questionnaire to supplement the scope of the EEOC Charge.

In sum, while Plaintiff "was not required to sign a charge that did not fairly represent [his]

claims," once he did, "the court's review is limited to claims properly brought within the EEOC

charge, [and] the court will not consider the claims alleged in the initial inquiry to expand the scope

of the charge." *Brown v. Univ. of N.C. Health Care Sys.*, Civ. No. TDS-20-0086, 2021 WL

512222, at *8 (M.D.N.C. Feb. 11, 2021).  The only documentation timely provided to Defendant,

the EEOC Charge, cannot be reasonably construed to allege hostile work environment or disparate

pay claims.  Accordingly, Plaintiff has failed to administratively exhaust those claims.[4]

---

[4] Even if the Court could consider Plaintiff's questionnaire, it is not clear that it would remedy the administrative flaws with his hostile work environment and unequal pay claims.  First, like the EEOC Charge, the questionnaire does not mention unequal pay.  Second, although the questionnaire contains a conclusory assertion that "Counts has created a Hostile Work Environment for many years," the only evidence Plaintiff provides of such an environment is the *Gone with the Wind* party, which occurred in August 2018.  (*See* EEOC Intake Questionnaire at 5, Miller Decl. Ex. C, ECF No. 14-8.)

Although even "an isolated incident[] of harassment can amount to discriminatory changes in the terms and conditions of employment if that incident is extremely serious," *Pryor v. United Air Lines, Inc.*, 791 F.3d 488, 496 (4th Cir. 2015) (internal quotation marks and citation omitted) (alteration in original), Plaintiff's complaint about such incident would be untimely under Title VII absent allegations that the party was part of a broader pattern creating a hostile work environment. *See* 42 U.S.C. § 2000e-5(e)(1) (requiring that all charges be filed within either 180 or 300 days of the alleged unlawful employment practice).  Neither Plaintiff's questionnaire nor his Complaint allege that this "incident [is] part of a single, ongoing pattern of discrimination," meaning that Plaintiff's claims for hostile work environment would be administratively barred for this additional reason. *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 219–20 (4th Cir. 2007) (internal quotation marks and citation omitted) (holding that a plaintiff "cannot benefit from the continuing violations theory" to evade the Title VII time bar where he has only alleged "discrete acts of discrimination [even if] plaintiff asserts that such discrete acts occurred as part of a policy of discrimination").

14

### C. Failure to State a Claim

Defendant further argues that Plaintiff's claims arising from his termination fail to state a claim for relief under Federal Rule of Civil Procedure 12(b)(6). (Mot. Dismiss Mem. Supp. at 11–13.) In *Evans*, the Fourth Circuit explained that allegations outside the scope of the charge "cannot stand as separate charges of discrimination for which [a defendant] may be liable," but "might be admissible as evidence at trial to support [a] properly asserted [ ] discrimination claim." 80 F.3d at 963. Accordingly, the Court will consider the entirety of the Complaint in evaluating whether Plaintiff's remaining claims under Title VII and the ADA state a claim.

The parties dispute the pleading standard that Plaintiff must meet for his claim to survive dismissal. (*Compare* Mot. Dismiss Mem. Supp. at 11–12, *with* Opp'n Mot. Dismiss at 26.) Resolving this dispute requires briefly canvassing the intersection of three aspects of federal civil rights litigation beginning with *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). In *McDonnell Douglas*, the Supreme Court established a "tool for assessing claims, typically at summary judgment, when the plaintiff relies on indirect proof of discrimination." *Gary v. Facebook, Inc.*, 822 F. App'x 175, 180 (4th Cir. 2020) (citation omitted). Under this framework, a plaintiff must first establish a *prima facie* case of discrimination. *Id.* To establish a *prima facie* case that a plaintiff was subject to retaliatory termination, a plaintiff must demonstrate "(1) that she engaged in a protected activity, as well as (2) that her employer took an adverse employment action against her, and (3) that there was a causal link between the two events." *Boyer-Liberto v. Fontainebleu Corp.*, 786 F.3d 264, 281 (4th Cir. 2015) (internal quotation marks and citation omitted). Alternatively, to establish a *prima facie* case of discriminatory discharge a plaintiff "must show that: (1) she is a member of a protected class; (2) she was qualified for her job and her job performance was satisfactory; (3) that, in spite of her qualifications and satisfactory

15

performance, she was discharged; and (4) that the position remained open to similarly qualified applicants after her dismissal or was filled by a member outside the protected class." *Siraj v. Hermitage in Northern Va.*, 51 F. App'x 102, 109 (4th Cir. 2002).

If a plaintiff establishes a *prima facie* case of discrimination or retaliation, "the burden shifts to the defendant to produce a legitimate, nondiscriminatory reason for the adverse decision." *Gary*, 822 F. App'x at 180 (citation omitted). And last, "[i]f the defendant offers such a reason, the burden then returns to the plaintiff to prove . . . that the stated reason for the adverse employment action is a pretext and the true reason is discriminatory or retaliatory." *Id.* (internal quotation marks and citation omitted).

As the Supreme Court clarified in *Swierkiewicz v. Sorema, N.A.*, this burden-shifting framework is inapposite at the motion to dismiss stage because *McDonnell Douglas* "is an evidentiary standard, not a pleading standard." 534 U.S. 506, 510 (2002). Rather, a civil rights plaintiff must only comply with "Federal Rule of Civil Procedure 8(a)(2), which provides that a complaint must include only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Id.* at 512 (quoting Fed. R. Civ. P. 8(a)(2)). However, while *McDonnell Douglas* may not be directly applicable, it remains useful for triangulating the requisite standard following the significant shift in federal pleading announced by the Supreme Court in *Twombly* and *Iqbal*. *See Woods v. City of Greensboro*, 855 F.3d 639, 646–48 (4th Cir. 2017) (citations omitted) (discussing intersection of *Swierkiewicz* and modern pleading framework); *see also supra* Part II (explaining pleading standards articulated in *Twombly* and *Iqbal*). The Fourth Circuit has confirmed that even after these developments, "*Swierkiewicz* remain[s] binding precedent and the plaintiff [is] not required to 'plead facts establishing a prima facie case of discrimination to survive

16

a motion to dismiss.'" *Id.* at 648 (quoting *McCleary-Evans v. Md. Dep't of Transp., State Highway Admin.,* 780 F.3d 582, 588 (4th Cir. 2015)).

Rather, a Plaintiff is only "required to allege facts to satisfy the elements of a cause of action created by [the relevant] statute." *Id.* (internal quotation marks and citation omitted) (alteration in original). Accordingly, here, Plaintiff must plead facts that—taken as true—establish that he was terminated by Defendant in retaliation for engaging in protected activity or because of his race, gender, or disability. *See* 42 U.S.C. §§ 2000e-2, 2000e-3; *see also Adams v. Anne Arundel Cnty. Pub. Schools,* 789 F.3d 422, 430 (4th Cir. 2015) (citation omitted) ("The ADA forbids employers from discriminating against persons with disabilities [and t]he Act also bars employers from retaliating against employees for seeking those statutory protections.").

Admittedly, in the context of retaliatory termination claims, these standards may largely collapse. For instance, the Second Circuit has held that a properly pleaded retaliation claim must "plausibly allege that (1) defendants discriminated—or took an adverse employment action— against him, (2) because he has opposed any unlawful employment practice" as well as "plausibly plead a connection between the act and his engagement in protected activity." *Vega v. Hempstead Union Free Sch. Dist.,* 801 F.3d 72, 90 (2d Cir. 2015); *see also Boyer-Liberto,* 786 F.3d at 281 (imposing similar requirement for a *prima facie* case of retaliation). That said, the rejection of *McDonnell Douglas* as a pleading standard shows that Defendant's arguments for dismissal are premature.

Defendant primarily argues that Plaintiff fails to state a claim because his EEOC Charge asserts that "the reason for his discharge was due to the manner in which he handled the [Krehbiel] situation with a company-wide email instead of bringing this issue to the attention of upper management and the CEO." (Mot. Dismiss Mem. Supp. at 12–13 (quoting EEOC Charge at 1).)

17

Defendant reasons that because Plaintiff admits that he was discharged for a non-discriminatory reason, he is "preclud[ed] from demonstrating a pretextual motive as a matter of law." (*Id.*) However, a legitimate explanation for an employment decision (and rebuttal of this explanation as pretext) are the second and third stages of the *McDonnell Douglas* framework. *See Gary*, 822 F. App'x at 180. Requiring Plaintiff to plead that Defendant's explanation was pretextual would transform the *McDonnell Douglas* standard from "a flexible evidentiary standard . . . into a rigid pleading standard for discrimination cases," exactly what the Supreme Court rejected in *Swierkiewicz*. 534 U.S. at 512.

Rather, at the pleading stage, alternative explanations for an allegedly discriminatory employment action may vitiate a claim if they render it "not plausible in light of [an] 'obvious alternative explanation[].'" *McCleary-Evans*, 780 F.3d at 588 (quoting *Iqbal*, 556 U.S. at 682). Here, Plaintiff's allegations of discrimination and retaliation are not rendered implausible by Defendant's contemporaneously proffered reason for his termination. Plaintiff alleges that his termination occurred shortly after he both sought an accommodation for his disability and raised complaints about Krehbiel's racist and homophobic public statements. *See Vicino v. Maryland*, 982 F. Supp. 2d 601, 614 (D. Md. 2013). In further support of his Title VII discrimination claim, Plaintiff also alleges that Defendant has historically taken harsher employment actions against black employees than similarly situated white employees. (Compl. ¶¶ 45–50.) Likewise, Plaintiff has buttressed his ADA claim with allegations that Defendant's employees—including its CEO— were critical of his requested accommodation and attempted to force him to forego this accommodation and return to in-person work. (*Id.* ¶¶ 22–31.) In light of the close temporal nexus between Plaintiff's protected activity and his termination as well as the specific instances of discrimination that he alleges in his Complaint, the Court does not find that Defendant's proffered

18

rationale for Plaintiff's termination constitutes an obvious alternative explanation that renders Plaintiff's claims implausible. *Cf. Ali v. BC Architects Eng'rs, PLC*, 832 F. App'x 167, 171 (4th Cir. 2020) (internal quotation marks and citations omitted) (finding plaintiff's discrimination claim implausible where her allegations that the defendant "treated other, non-Arab employees more considerately when terminating them—for example, by giving them adequate time to collect their personal belongings," were "too speculative and nonspecific to defeat a 12(b)(6) motion").

### D. State Law Claims

As noted, Plaintiff also brings claims of discrimination and retaliation under the state and local analogues to Title VII and the ADA. (*See* Compl. ¶¶ 86–96.) Courts have generally treated these claims as coextensive with their federal counterparts, and the parties have not provided any authority to the contrary. *See Bynum v. Martin*, Civ. No. GJH-16-2067, 2016 WL 7468050, at *6 (D. Md. Dec. 27, 2016) (citation omitted) ("Plaintiff also raises an identical state law claim under FEPA, which other judges in this district have held to be interpreted consistently with Title VII."); *Saah v. Thumel*, Civ. No. RDB-15-2425, at *7 (D. Md. Feb. 7, 2017) (quoting *Peninsula Reg'l Med. Ctr. v. Adkins*, 448 Md. 197, 218 (2016)) ("The Court of Appeals of Maryland has held that the definitions of 'disability' under the ADA and Maryland law are 'nearly identical.' The same principle holds for county-level anti-discrimination laws."). That said, confirming that at least some of Plaintiff's federal claims are viable was necessary to confirm the propriety of this Court's exercise of supplemental jurisdiction over the state law claims. *See Banks v. Martirano*, Civ. No. CCB-20-1904, 2020 WL 5849477, at *3 (D. Md. Oct. 1, 2020) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)) ("When, as here, 'the federal-law claims have dropped out of the lawsuit in its early stage and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case

without prejudice."). Having established that at least some federal claims—those stemming from Plaintiff's termination—survive Defendant's Motion to Dismiss, the Court turns to Plaintiff's state law claims.

As noted, neither party argues that any state law claims should survive where the federal claims fail or vice-versa. Most relevant here, Plaintiff has not argued that his unexhausted federal claims are administratively proper under state law. *See Schwenke v. Ass'n of Writers & Writing Prog.*, Civ. No. DKC-20-1234, 2021 WL 22422, at *3 n. 5 (D. Md. Jan. 4, 2021) (citation omitted) ("FEPA also imposes exhaustion requirements akin to those under Title VII."); *see also* MD. CODE. ANN., STATE GOV'T § 20-1013(a). Accordingly, Plaintiff's state law claims will remain coextensive with his federal claims, i.e. claims arising from Plaintiff's termination state a claim, but independent claims arising from incidents not alleged in the EEOC Charge are unexhausted and will be dismissed.

## IV.   *Conclusion*

For the foregoing reasons, an order will issue granting in part and denying in part Defendant's Motion to Dismiss (ECF No. 13) consistent with this Memorandum.

DATED this 22 day of July, 2021.

BY THE COURT:

James K. Bredar
Chief Judge